UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ANDREW BRYANT SHEETS,

Plaintiff,

v.

Case No. 2:25-cv-61-KCD-KRH

MATTHEW WOELK, IN PERSONAL CAPACITY; CITY OF PUNTA GORDA; CODY WALDROP, IN PERSONAL CAPACITY,

Defendants.

______________________________/

# ORDER

Andrew Sheets is a self-proclaimed citizen journalist. Years ago, he took his camera to the Charlotte Harbor Event and Conference Center to "incite the public into thought" about an illegal list of gun owners kept by the Charlotte County Sheriff. That day, the Event Center was hosting a gun show, and he wanted to let people know about the list and get their reactions. Once Sheets began shouting, Event Center staff called the police. Officers Cody Waldrop and Matthew Woelk arrived, and Sheets was issued a trespass warning that ejected him from Event Center and banned him from the property for a full year. (Doc. 142-4.)[1] We have a front-row seat to the dispute, as the entire event was captured on Sheets and Woelk's body

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

cameras. (Docs. 149, 150.) The Court also has a recording of the initial 911 call. (Doc. 149.)

Sheets, proceeding pro se, argues that his constitutional rights were violated. The case has been pruned since its filing, leaving one claim against the City of Punta Gorda for procedural due process under the Fourteenth Amendment for the City's failure to provide a process to challenge the trespass warning; one claim against Officer Woelk for retaliation under the First Amendment; and one claim against Officers Woelk and Waldrop for conspiracy. The officers have moved for summary judgment, asserting that Sheets has failed to establish that his First Amendment rights were violated. (Doc. 138.) The City, too, seeks summary judgment, contending that Sheets lacked a constitutionally protected liberty interest to remain on the property. Sheets has responded (Doc. 142), making this matter ripe. For the reasons below, Defendants' motion is **GRANTED**.

## I. Background

To make sense of the events that followed, it helps to introduce the other relevant players. The Event Center is owned by Charlotte County but is operated and managed by a private company, ASM Global. Michelle Maldonado-Flores works for ASM as an event manager. Rounding out the cast is Weiser Security—another private entity contracted to provide security at the Event Center—and its employee, Ron Janz.

To get a sense of the geography, the record provides a bird's-eye view that is helpful. The Event Center (in the highlighted area) is bordered by the Peace River, the onramp to the Tamiami Trail bridge, and Taylor Street:




(Doc. 138-2 at 3.)

On the weekend of January 23 and 24, 2021, a private company—Two Guys Gun Show—rented the Event Center for a ticketed exhibition. Sheets arrived on the second day, but he did not come to browse the convention floor; he had no ticket to get inside. Instead, he showed up to protest. (Doc. 138-1 at 110:41-17.) He wore a shirt that read "Fuck Policing 4 Profit," and held a sign that read "R U ON THE SHERIFFS ILLEGAL LIST OF GUN OWNERS."

(Doc. 150.) The sign also had the photos of two police officers, labeling them as criminals and "ENEMY OF THE PEOPLE." (*Id.*)

Within an hour of Sheets's arrival, Officer Woldrop pulled up to the scene. What brought him there was a call from Janz. (Doc. 150 at 19:38.) Janz testified that Sheets was "being loud near the entrance and harassing attendees." (Doc. 138-5 ¶ 13.) After Janz relayed these observations to Maldonado-Flores, she instructed him to call 911. (*Id.* ¶ 14.) According to Janz, that decision had nothing to do with Sheets's message, his sign, or his expressive activity. (*Id.* ¶ 15, 19.) It was, he insists, a matter of pure crowd control—driven by operational and security needs, like ensuring safe visitor access and maintaining orderly entry into the venue.

Sheets reads a far more sinister motive into the sequence of events. He contends the 911 call reveals a pre-coordinated plan between the officers and Janz. On the audio, Janz tells the dispatcher that "he" is harassing people outside, adding that the officers had instructed him to call. (*See* Doc. 149.) Though the audio is somewhat garbled, Janz never appears to mention Sheets by name—a detail Sheets seizes upon as proof that the officers had already orchestrated the encounter before the phone ever rang.

Maldonado-Flores also observed Sheets outside the event center. From her vantage point, she watched Sheets shouting and engaging with attendees in a manner that struck her as heated and agitated. (Doc. 138-9 ¶ 9.) She also

took note of his attire—a shirt with explicit language, a skull mask, and holding a sign about an illegal gun ownership database. (*Id.*) Maldonado-Flores relayed her concerns to her manager, Jim Finch, who told her that if someone was causing a disturbance during a rented event, ASM staff were permitted to request law enforcement to issue a trespass warning. (*Id.* ¶¶ 11-13.) Sheets offers no evidence to dispute Maldonado-Flores's recitation of what happened that day.

When Officer Waldrop arrived, he found Sheets standing outside the Event Center directly adjacent to the staircase entrance. Officer Waldrop confronted Sheets and told him the department had fielded several calls about his presence. (Doc. 138-6 ¶ 14; Doc. 150 at 0:51-1:00.) Officer Waldrop told Sheets that his supervisor (Woelk) was on the way to provide him a citation for an unrelated incident. Officer Waldrop then stood next to Sheets until Officer Woelk arrived.

The wait was not a quiet one. Officer Waldrop's body camera captured Sheets actively engaging—and frequently arguing—with the Event Center's patrons. (Doc. 150 at 5:07.) At one point, when a passerby disagreed with him, Sheets asked if the person was German before lobbing a jarring retort: "You should go get in the shower then, that's fine. Go on the train, get in the shower." (*Id.* at 8:06.) He told another patron that the Event Center staff were "nazis." (*Id.* at 13:11, 13:20.)

When Officer Woelk arrived, the dispute crystallized. He first touched base with Janz and Maldonado-Flores, who made their position clear: they wanted Sheets trespassed from the property. They insisted their request was driven by the disturbance Sheets was causing. (Doc. 138-9 ¶ 15.) Officer Woelk obliged. He explained to Sheets that Event Center management had made the call and pointed out that Sheets was standing on Event Center property. (Doc. 150 at 12:55-13:17.) Officer Woelk then provided Sheets with the trespass warning (Doc. 142-4) and directed him to the public sidewalk off Event Center property as he walked away. (Doc. 150 at 13:18-13:54.)

Sheets's First Amendment claim hinges on exactly where he was protesting that day. "It is well settled that the government need not permit all forms of speech on property that it owns and controls." *Wright v. Marshall Cnty. Alabama*, 752 F. Supp. 3d 1244, 1261 (N.D. Ala. 2024). "Regulation of speech on government property that has been traditionally open to the public for expressive activity, such as public streets and parks, is subject to strict scrutiny." *United States v. Gilbert*, 920 F.2d 878, 884 (11th Cir. 1991). But "[r]egulation of speech on government property not by tradition or designation a forum for public communication is examined only for reasonableness." *Id.*

Defendants maintain that Sheets was standing on the non-public walkway between the Event Center parking lot and the building. To support

this position, they offer an affidavit from Stephen Kipa, who works as Charlotte County's real estate services manager and is familiar with the boundaries of the Event Center. (Doc. 138-2.) Kipa says that the area where Sheets stood is not a public sidewalk or right-of-way. Rather, it is a "continuation of the parking lot and is solely a transitional area to the Event Center Building." (*Id.* ¶¶ 9, 11.) And when the Event Center is rented out—as it was that weekend—the space is reserved exclusively for the event's organizers and ticketed attendees, not the public at large. (*Id.* ¶ 12.) The bodycam footage corroborates this layout, leaving no genuine dispute about Sheets's physical location. (Doc. 150.) Going back to the map above, this is where Sheets stationed himself:



(Doc. 138-2 at 3.)

## II. Legal Standard

Summary judgment is not a substitute for trial. It is appropriate only "when a movant shows that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law." *Gonzalez v. Indep. Ord. of Foresters*, No. 24-10758, 2025 WL 337898, at *2 (11th Cir. Jan. 30, 2025). "When deciding a motion for summary judgment, a judge is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Las Brisas Condo. Homes Condo. Ass'n, Inc. v. Empire Indem. Ins. Co.*, No. 2:21-CV-41-KCD, 2023 WL 8978168, at *1 (M.D. Fla. Dec. 28, 2023). "An issue is genuine if a reasonable jury could return a verdict for the nonmoving party." *Do v. Geico Gen. Ins. Co.*, No. 1:17-CV-23041-JLK, 2019 WL 331295, at *2 (S.D. Fla. Jan. 25, 2019).

"The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial." *Andrews v. Ciccone*, No. 3:23-CV-88-MMH-SJH, 2025 WL 2508878, at *2 (M.D. Fla. Sept. 2, 2025). "[A] fact is material if it may affect the outcome of the case under the applicable substantive law." *Toca v. Debonair Props. LLC*, No. 2:23-CV-303-KCD, 2025 WL 2106674 (M.D. Fla. July 28, 2025).

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995). This requires the nonmovant to "identify specific evidence in the record" and "articulate the precise manner in which that evidence supports [its] claim." *Alexander as trustee of Franklin Pharmacy, LLC v. Aaron*, No. 3:15-CV-1314-AKK, 2017 WL 11437294, at *1 (N.D. Ala. June 1, 2017); *see also Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 177 (5th Cir. 2016).

## III. Discussion

### A. Retaliation (Count II) & Conspiracy (Count IV)

We start with Sheets's core remaining grievance: Officer Woelk ousted him from the Event Center as retaliation for exercising his First Amendment rights, and both officers unlawfully conspired to orchestrate the removal.

The First Amendment bars governmental bodies—including municipalities and their employees—from "abridging the freedom of speech." U.S. Const. amend. I*; see also Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1268 (11th Cir. 2004) ("The First Amendment, as incorporated through the Due Process Clause of the Fourteenth Amendment, applies to state and municipal governments, state-created entities, and state and

municipal employees[.]”). This means police departments and their officers cannot “regulate speech in ways that favor some viewpoints or ideas at the expense of others.” *Moms for Liberty-Brevard Cnty., FL v. Brevard Pub. Schs.*, 118 F.4th 1324, 1331 (11th Cir. 2024). Nor can they retaliate against speakers for exercising their freedom of speech. *See, e.g.*, *Bell v. Sheriff of Broward Cnty.*, 6 F.4th 1374, 1376 (11th Cir. 2021).

To proceed on a retaliation claim, Sheets must prove: (1) speech or activity protected by the First Amendment, (2) adverse action, and (3) a causal connection between the protected speech or activity and the adverse action. *Turner v. Williams*, 65 F.4th 564, 579 (11th Cir. 2023); *see also Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) (“[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies.”). “We recognize First Amendment retaliation claims because [t]he Amendment protects not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right.” *Turner*, 65 F.4th at 579-80.

Evaluating whether Sheets engaged in protected speech requires the Court to analyze where that speech occurred. As mentioned, location is everything in First Amendment law. The government’s power to limit speech shifts dramatically depending on the setting. On a public street or in a park, the government’s hands are largely tied. These are “traditional public fora,”

places where citizens have gathered for centuries to debate the news of the day. *McCullen v. Coakley*, 573 U.S. 464, 476 (2014). "[T]he guiding First Amendment principle that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content applies with full force in a traditional public forum." *Id.* at 477.

If the Event Center is more like private property, however, Sheets has a problem. That is because citizens have no absolute interest in speaking on land where they don't belong. *See, e.g.*, *Watkins v. Willson*, 824 F. App'x 938, 940 (11th Cir. 2020) (explaining there is no "constitutionally protected liberty interest in remaining on private property"). "A government can restrict speech in a nonpublic forum if those restrictions are reasonable in light of the purpose served by the forum[.]" *Wright*, 752 F. Supp. 3d at 1262.

Sheets seemingly argues that he was engaged in protected First Amendment activity because he was standing on a sidewalk. But not all concrete is created equal in this context. The "mere physical characteristics of the property cannot dictate forum analysis." *United States v. Kokinda*, 497 U.S. 720, 727 (1990). Instead, the inquiry turns on the actual location and purpose of the pathway. *Id.* at 727-28. So, for example, "a sidewalk running between a parking lot and a post office was not a traditional public forum—even though it looked exactly like adjacent municipal sidewalks—[because]the government built that sidewalk only to allow postal customers

to navigate between the parking lot and the post office's front door." *Keister v. Bell*, 29 F.4th 1239, 1253 (11th Cir. 2022).

Sheets maintains he was in a public forum, but the record tells a different story. According to the City's evidence, which stands unrebutted, this specific sidewalk is not a public right-of-way. (Doc. 138-2.) Instead, it serves merely as a continuation of the Event Center parking lot—a transitional path built solely to funnel visitors to the venue. (*Id.*) And crucially, when the Event Center is rented out, that area is reserved exclusively for the event's organizers and ticketed attendees. (*Id.*) As Kipa notes, the only part of the property that stays open to the public is the walkway running alongside the Peace River, which is where Sheets was directed by the officers after the trespass warning. (*Id.* at 3.)

Sheets offers no evidence to the contrary. He points to nothing in the record showing that members of the public used (or were permitted to use) this specific area during ticketed exhibitions. Instead, the only evidence before the Court comes straight from the City, confirming that the area was an exclusively permitted space. And the law is clear on the consequences of that arrangement: "When the government grants exclusive use and control of a public property to a private party, the private party may exercise discretion in admitting individuals and regulating their conduct." *Jankowski v. City of*

*Duluth*, No. 11-CV-3392 MJD/LIB, 2011 WL 7656905, at *9 (D. Minn. Dec. 13, 2011).

The only pushback Sheets offers is Charlotte County Facility Rule 7, which provides:

> THE FOLLOWING CONDUCT IS PROHIBITED BY COUNTY ORDINANCE 2016-027
>
> 7. Solicitation of petitions, pamphleteering, demonstrating protesting or carrying banners or signs anywhere inside of County buildings or conveyances, or in areas where such activities are otherwise prohibited on County lands. However, these activities may be done in an orderly manner outside of the entryway of any County-owned building, on any public sidewalk or public right-of-way near or adjacent to any County-owned building, or in areas otherwise designated for expressive activity, provided they do not impede ingress or egress; interfere with the use of County facilities by visitors, employees or County officials; or harass visitors, employees or County officials.

(Doc. 138-4 at 4.) But leaning on Rule 7 gets him nowhere. His argument ignores the actual evidence, which provides that when the Event Center is rented to a private party, it is reserved for the event's organizer. For the duration of the rental, it effectively loses its status as a general-use County space open to the public. Rule 7, by its plain language, permits orderly protests on a "public sidewalk or public right-of-way." Yet as seen, the pathway Sheets occupied was neither. The First Amendment does not guarantee access to property simply because the government holds the deed, especially when that space has been temporarily cordoned off for a private function. *See Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 957 (9th

Cir. 2008) ("[I]f the ability to exclude others from public property during the course of a limited, permitted use were found to be a constitutional violation, [e]very picnic, wedding, company outing, meeting, rally, and fair held on public grounds would be subject to constitutional scrutiny.").

By his own admission, Sheets was not a ticketed patron of the gun show, nor did he have any interest in attending the exhibition. He was there solely to protest at the venue's front door. But because the County had turned that space over to a private organization for a ticketed event, the entryway functioned as a nonpublic forum reserved strictly for the organizers and their guests. Consequently, excluding an uninvited, non-ticketed individual from that area does not offend the Constitution. The First Amendment simply does not demand that a private lessee throw open its reserved entryways to anyone who wishes to set up a picket line. *See McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076, 1099 (N.D. Fla. 2016) ("Courts have not hesitated to hold that exclusive, ticketed, or otherwise nonpublic events held on public property are not traditional public fora."). And that conclusion stops Sheets's retaliation claim. Because he had no First Amendment right to commandeer an exclusively rented space for his protest, his activity was not per se protected and the officers were reasonable in asking him to leave at the request of Event Center staff. *See, e.g.*, *Watkins v. Fort Lauderdale Police Officer*, No. 24-11030, 2025 WL 902117, at *3 (11th Cir. Mar. 25, 2025)

("[G]overnment restriction of speech in a nonpublic forum is examined only for reasonableness.").

But even suppose this forum analysis misses the mark, Sheets's First Amendment claim still fails. That is because the officers are entitled to qualified immunity. As the Supreme Court has repeatedly reminded us, qualified immunity shields police officers from personal liability unless they violate a "clearly established" constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). For a right to be clearly established, the legal rule cannot be pitched at a high level of generality. It must be so clear that every reasonable officer would have understood that his specific conduct violated the Constitution. *D.C. v. Wesby*, 583 U.S. 48, 63 (2018). Sheets has not pointed to a single case or authority—nor has the Court found one—holding that an officer violates the First Amendment by enforcing a trespass request against an uninvited protester standing in the transitional entryway of a rented public facility. Without something to put the officers on notice, they cannot be held liable for making a judgment call on the ground and trespassing Sheets when requested by the Event Center staff. *See Watkins*, 2025 WL 902117, at *3.

Sheets's conspiracy claim meets the same fate. To prove a conspiracy under § 1983, a plaintiff must show more than an agreement between the defendants. He must prove that the conspiracy resulted in the denial of a

constitutional right. *GJR Invs., Inc. v. Cnty. of Escambia, Fla.*, 132 F.3d 1359, 1370 (11th Cir. 1998). Put simply, an actionable wrong is the necessary bedrock of this conspiracy charge. For the reasons explained above, there is no underlying constitutional violation (*i.e.*, no First Amendment retaliation) to anchor his claim. Without that foundation, the conspiracy claim necessarily collapses. *See Dixon v. City of Lawton, Okl.*, 898 F.2d 1443, 1449 (10th Cir. 1990). And even if Sheets could somehow cobble together an underlying constitutional violation, the officers would still be shielded by qualified immunity for the very same reasons discussed. If the law did not clearly put the officers on notice that enforcing the trespass request violated the First Amendment, it certainly did not clearly establish that agreeing to enforce it amounted to an unconstitutional conspiracy.

**B. Due Process (Count III)**

Next, Sheets turns his sights on the City of Punta Gorda. He argues that the City's trespass policy violates the Due Process Clause because it acts as a one-and-done deprivation: once you are warned, you are banned for a year, with no hearing and no way to appeal. (Doc. 75 at 22-23.)

A plaintiff raising a procedural due process claim must show: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). Sheets's claim fails on the first element.

As discussed, the area where he was protesting operated as a nonpublic forum where he was not welcome and had been asked to leave. In order to trigger the protections of the Due Process Clause, Sheets must show that he has a "legitimate claim of entitlement" to remain on the Event Center property. *Richman v. Straley*, 48 F.3d 1139, 1143 (10th Cir. 1995). A plaintiff has a property interest in those things to which she has "a legitimate claim of entitlement." *The Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Sheets has not shown he had a constitutionally protected liberty interest that day that would trigger protection by the due process clause.

But even if he could get past this hurdle, Sheets has not shown a constitutionally inadequate process. The touchstone of procedural due process is notice and a meaningful opportunity to be heard. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). According to Sheets, there was no vehicle to contest the trespass ticket. As the Eleventh Circuit has explained "again and again," however, a procedural due process claim "can exist only if no adequate state remedies are available." *Flagship Lake Cnty. Dev. No. 5, LLC v. City of Mascotte, Fla.*, 559 F. App'x 811, 815 (11th Cir. 2014). "It is the state's failure to provide adequate procedures to remedy the otherwise procedurally flawed deprivation of a protected interest that gives rise to a federal procedural due process claim." *Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir. 2000). "This rule recognizes that the state must have

the opportunity to remedy the procedural failings of its subdivisions and agencies . . . before being subjected to a claim alleging a procedural due process violation." *Flagship Lake*, 559 F. App'x at 814.

Consequently, if a state provides a working legal mechanism to cure the procedural defect alleged, there is no federal constitutional violation. *See, e.g.*, *Kessler v. City of Key W.*, No. 21-11069, 2022 WL 590892, at *3 (11th Cir. Feb. 28, 2022). "The existence of a state judicial procedure to review, remand, and/or set aside agency decisions," whether used by the plaintiff or not, "is sufficient to satisfy the Fourteenth Amendment's Due Process Clause." *Dibbs v. Hillsborough Cnty., Fla.*, 67 F. Supp. 3d 1340, 1354 (M.D. Fla. 2014).

A lack of adequate state remedies or procedures is thus "an element to a procedural due process claim." *Dennis v. Brevard Cnty.*, No. 6:17-CV-1971-ORL-37-GJK, 2018 WL 1939490, at *4 (M.D. Fla. Mar. 23, 2018). But Sheets has not shown, or even argued, that Florida's state courts were unequipped to fix his grievance. Had he wanted to challenge the officer's trespass ticket, Sheets could have pursued a writ of mandamus, a declaratory judgment, or a writ of certiorari in state court. *See, e.g.*, *Kessler*, 2022 WL 590892, at *3 n.3 (explaining that mandamus relief would be available to challenge a city's action to terminate a lease); *City of Miami v. State ex rel. Houston*, 102 So. 2d 176, 177 (Fla. Dist. Ct. App. 1958) (granting mandamus relief from a decision by a city manager); *Parker v. Dep't of Highway Safety & Motor Vehicles*, 338

So. 3d 450, 452 (Fla. Dist. Ct. App. 2022) (writ of certiorari used to contest revocation of drivers license).

Sheets maintains that the adequacy and availability of these state procedures "remain disputed issues of fact." (Doc. 142 ay 8.) But calling something a fact does not make it one. Whether a state provides adequate remedial procedures is a question of law, not a factual dispute for a jury to untangle. A plaintiff cannot manufacture a genuine dispute of material fact simply by closing his eyes and denying that state-law remedies exist. And on the legal question that actually matters—whether Florida's mechanisms for judicial review fall short of constitutional demands—Sheets offers no argument whatsoever. This Court is not in the business of inventing legal arguments for a litigant who chooses to stay silent. *See Herman v. Mr. Cooper Grp. Inc.*, No. 2:23-CV-948-JES-KCD, 2024 WL 3277021, at *1 (M.D. Fla. July 2, 2024) ("In our adversarial system, a claimant must present her case. It is not a court's job to conduct research to provide the proper support for [missing] arguments.").

One last issue. Sheets protests that Defendants improperly stonewalled him during discovery. Invoking Fed. R. Civ. P. 56(d), he asks the Court to deny summary judgment because he is missing critical records. But the time to litigate discovery disputes has long passed. If Sheets believed Defendants were withholding evidence, the proper course was to raise that issue during

discovery, not to hold the grievance in reserve and deploy it as a shield at the summary judgment stage. Rule 56(d) is not a mechanism to forestall resolution when the party failed to diligently pursue discovery. *Fla. Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1316 (11th Cir. 1990). Because the discovery deadline is firmly in the rearview mirror, and Sheets failed to properly press these disputes when it actually mattered, his last-minute plea to derail summary judgment is denied.

## IV. Conclusion

Because Sheets cannot establish the essential elements of his constitutional claims, the case ends here. Defendants' Motion for Summary Judgment (Doc. 138) is **GRANTED**. The Clerk is **DIRECTED** to enter judgment, terminate any pending deadlines, and close the case. The pending motions (Docs. 141, 145) will remain open pending disposition by the Magistrate Judge.

**ORDERED** in Fort Myers, Florida on August 10, 2026.



Kyle C. Dudek
United States District Judge